### AFFIDAVIT OF SPECIAL AGENT TARAH E. RANKINS IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Tarah E. Rankins, state:

### Introduction and Agent Background

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am an investigative or law enforcement officer of the United States within the meaning 18 U.S.C. §2510(7), and I am empowered by law to conduct investigations of and make arrests for offenses enumerated in that section. I have been employed by the FBI since September 2012 and have been a Special Agent since June 2015, when I joined the Organized Crime Squad of the FBI's Boston Division. My primary duties on the OCTF include the investigation of Eurasian criminal enterprises, specifically Balkan organizations.

2. In addition to my 21 weeks of basic investigative training at the FBI Academy in Quantico, Virginia, I have received training on investigating technology-based and cyber-based crimes, including the following: yearly computer based training on basic cybercrime topics and basic cellular technology exploitation; and in-service trainings on advanced cellular technology exploitation.

3. As a FBI Special Agent, I have utilized various investigatory tools and techniques, including confidential informants, cooperating witnesses, undercover agents, physical surveillance, search warrants, telephone toll analysis, court-authorized electronic surveillance, grand jury investigations, and witness interviews. I am familiar with the benefits and limitations of these techniques. I have previously submitted an affidavit in support of a search warrant in the United States District Court for the District of Massachusetts.

### Purpose of the Affidavit

4. This affidavit is being submitted in support of an application for a criminal

complaint charging CONSTANTIN DENIS HORNEA ("CONSTANTIN") and MARIA LAZAR ("LAZAR") with conspiracy to use counterfeit access devices, in violation of 18 U.S.C. § 1029(b)(2); and, during and in relation to such offense, using a means of identification of another person, knowing that the means of identification belonged to another actual person (i.e., aggravated identity theft), in violation of 18 U.S.C. § 1028A (hereinafter, the "Target Offenses").

5. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the issuance of the requested complaint and does not set forth all of my knowledge about this matter.

## Background

6. ATM skimming is described as surreptitiously obtaining the debit card numbers and corresponding personal identification numbers (PINs) of bank customers utilizing an ATM and thereafter making unauthorized withdrawals from those accounts. ATM skimming typically takes place in three stages. In the first stage, the skimmers acquire the account information and PINs of targeted accounts through the use of skimming devices. I am generally familiar with skimming devices. The skimming devices often consist of two parts, one to record the account information contained in the magnetic strip of a card (i.e., the access device) and the other to record the user's PIN (i.e., the camera). The former is made to look like the legitimate card access slot and does not interfere with the card access functions. The latter is usually a separate pinhole camera device that is discreetly hidden on the ATM or near it in a location from which the customer's input on the ATM keyboard can be observed. Each piece of information is stored on the separate part that recorded it; the information is typically downloaded to a computer and combined. Because of the risk of detection and limited battery length, skimmers typically install

and remove the skimming devices in the same day or 24 hour period.

7. In the second stage, the skimmers create cloned cards by using the information obtained by the skimming device. To obtain the PINs for each stolen account, the video must be viewed to see the account holder physically enter the digits on the ATM keypad.[1] In order to access the accounts illegally, the account information is burned to a cloned card. Such cloned cards constitute counterfeit access devices. 18 U.S.C. §§ 1029(d)(1) and (2).

8. In the third stage, the skimmers use the cloned cards and the account owner's PIN to withdraw money, typically the maximum withdrawal amount, from the account owner's account. This stage is also known as "cashing out." This complaint concerns CONSTANTIN and LAZAR's use of cloned cards to make several unauthorized withdrawals from Bank of America ATMs in Massachusetts on January 22, 2016.

**Probable Cause to Believe That CONSTANTIN and LAZAR Committed the Target Offenses**

9. As part of its investigation, the FBI has received information from Bank of America that skimming devices were installed on a Bank of America ATM at 1 Scammell Street, Quincy, Massachusetts, on January 16, 17, 18 and 20, 2016 (hereinafter, the "Quincy Skims"). I have reviewed the security video footage and confirmed that, on each of those four days, skimming equipment was successfully installed and subsequently removed from the ATM (neither CONSTANTIN nor LAZAR physically installed or removed the skimming equipment for the Quincy Skims). I am aware from Bank of America that the information for numerous bank accounts, including those described below, was stolen during the Quincy Skims, including Bank

---

[1] Because the account holder's hand must be viewed physically in order to learn the PIN, the skimmers are aware that the account holders are actual people.

of America accounts. I am also aware that Bank of America is engaged in interstate commerce.

10. According to additional information provided by Bank of America, I am aware that unauthorized withdrawals were made from the accounts whose information was obtained during the Quincy Skims. Based on my review of ATM security video footage, also provided by Bank of America, I am aware that CONSTANTIN and LAZAR made such unauthorized withdrawals on January 22, 2016, from Bank of America ATMs in Massachusetts (not the Scammell Street ATM), using counterfeit access devices, namely cloned cards.[2] Specifically, on January 22, 2016, the following transactions occurred involving accounts whose information was obtained during the Quincy Skims, except for one of the withdrawals, as described below.

11. At 7:14 p.m.,[3] CONSTANTIN entered the lobby of a Bank of America ATM at 1764 Washington Street, Hanover, Massachusetts, and began to conduct ATM transactions. At 7:15, 7:16, and 7:17 p.m., CONSTANTIN withdrew $500, $200, $100, respectively, from the bank account of Victim A. At 7:18, he withdrew $200 from the account of Victim B. At 7:19, he left the ATM lobby.

12. At 7:22 p.m., LAZAR entered the same ATM lobby and began to conduct

---

[2] I am aware of the appearances of CONSTANTIN and LAZAR from reviewing known photographs of them, including CONSTANTIN's booking photograph following his arrest and LAZAR's roadside pre-arrest photograph in Saluda, South Carolina, on July 10, 2017 (also on skimming charges); known photographs from the following pieces of identification: CONSTANTIN's Romanian driver's license found on his person during the Saluda arrest, CONSTANTIN's alias identification card in the name of FLORIN MITROI also found on his person during the Saluda arrest, LAZAR's translated foreign driver's license found on her person during the Saluda arrest and a copy of LAZAR's Romanian identity card found during a search of their former residence in Florence, South Carolina on July 20, 2016; and from numerous photographs obtained from Facebook, including a photograph taken on or about December 31, 2015 (about three weeks before the incidents described herein).

[3] All times herein are approximate and are based on the time stamps on the bank's recording equipment.

transactions.  At 7:25 and 7:27 p.m., LAZAR withdrew $200 and $500 from the accounts of Victim C and Victim D, respectively.  At 7:28 p.m., she left the ATM lobby.

13. At 8:54 p.m., CONSTANTIN entered the lobby of a Bank of America ATM at 620 Middle Street, Weymouth, Massachusetts, which has side-by-side ATMs, and began to conduct transactions.  At 8:54 p.m., CONSTANTIN withdrew $500 from the account of Victim E.  At 8:55 p.m., LAZAR entered the ATM lobby, approached the machine next to CONSTANTIN's, and began to conduct a transaction.  At 8:55 and 8:56 p.m., CONSTANTIN withdrew $300 and $500 from the accounts of Victim E and Victim F, respectively.  At 8:57 p.m., CONSTANTIN and LAZAR withdrew $500 each from the accounts of Victim F and Victim G, respectively.  At 8:58 and 8:59 p.m., respectively, LAZAR and CONSTANTIN left the ATM lobby.

14. At 10:03 p.m., CONSTANTIN entered the lobby of a Bank of America ATM at 10 Tremont Street, Braintree, Massachusetts, and began to conduct transactions.  AT 10:05 p.m., he withdrew $500 from the account of Victim H.  He left the ATM lobby sometime shortly after that transaction.

15. At 10:09 p.m., LAZAR entered the same ATM lobby and began to conduct transactions.  At 10:09 and 10:10 p.m., she withdrew $500 and $300, respectively, from the account of Victim I.  At 10:12 p.m., she left the ATM lobby.

16. I know the following information about the victims.

   a. I know the debit card number of Victim A but do not yet know Victim A's identity.  Based on the debit card number, I know that it is a Bank of America account.  I am attempting to ascertain Victim A's identity through Bank of America.  It does not appear that Victim A's card was compromised during the 1 Scammell Street skimming incident.  Bank of America is attempting to determine where Victim A's card information was stolen from.  I

likewise do not know at this time if Victim A detected and reported the fraudulent transactions to Bank of America. I believe that the transactions conducted against Victim A's account were fraudulent based on the dollar amounts, sequential nature, and the fact that CONSTANTIN conducted them as part of the sequence describe herein.

      b.    I know the debit card number and identity of Victim B. On January 25, 2016, Victim B reported a $200 fraudulent transaction to Bank of America.

      c.    I know the debit card number and identity of Victim C. On January 22, 2016, Victim C reported a $200 fraudulent transaction to Bank of America.

      d.    I know the debit card number and identity of Victim D. On January 23, 2016, Victim D reported a $500 fraudulent transaction to Bank of America.

      e.    I know the debit card number and identity of Victim E. On January 23, 2016, Victim E reported a $300 fraudulent transaction to Bank of America.

      f.    I know the debit card number and identity of Victim F. On January 25, 2016, Victim F reported $1000 worth of fraudulent transactions to Bank of America.

      g.    I know the debit card number of Victim G but do not yet know Victim G's identity. Based on the debit card number I know that it is a Bank of America account. I am attempting to ascertain Victim G's identity through Bank of America. It does not appear that Victim G's card was compromised during the 1 Scammell Street skimming incident. Bank of America is attempting to determine where and when Victim G's card information was stolen. I do not know at this time if Victim G detected and reported the fraudulent transaction to Bank of America. I believe that the transaction conducted against Victim G's account was fraudulent based on the fact the dollar amounts, sequential nature, and the fact that LAZAR conducted it as part of the sequence described in this affidavit. It also appears that LAZAR attempted to withdraw

another $500 from Victim G's account at 8:58 p.m., but the transaction was denied.

    h. I know the debit card number of Victim H. I am working through Bank of America to determine whether or not Victim H ever detected and reported the fraudulent transaction. I believe that the transaction conducted against Victim H's account was fraudulent based on the dollar amounts, sequential nature, and the fact that CONSTANTIN conducted it as part of the sequence described in this affidavit. It also appears that CONSTANTIN attempted to withdraw another $500 from Victim H's account at 10:05 p.m., but the transaction was denied.

    i. I know the debit card number and identity of Victim I. On January 23, 2016. Victim H reported a $300 fraudulent transaction to Bank of America.

  17. I believe that CONSTANTIN and LAZAR are married. I am also aware that they were arrested together on July 10, 2016, in Saluda, South Carolina, on skimming related charges. That case remains pending.

## CONCLUSION

  18. Based on my training and experience, all of the withdrawals made by CONSTANTIN and LAZAR discussed above were unauthorized, made use of counterfeit access devices (specifically the cloned debit cards), and did so knowing that those accounts belonged to actual people.

  19. Based on the information described above, I have probable cause to believe that CONSTANTIN DENIS HORNEA and MARIA LAZAR conspired and agreed with each other and other persons to knowingly and with intent to defraud, produce, use, and traffic in, one and more counterfeit access devices, to wit: counterfeit debit cards, in a manner affecting interstate commerce, in violation of 18 U.S.C. § 1029(b)(2); and, during and in relation to such offense, used a means of identification of another person, knowing that the means of identification belonged to

another actual person, in violation of 18 U.S.C. § 1028A(1).

      Sworn to under the pains and penalties of perjury,

                                                      TARAH E. RANKINS
                                                      Special Agent
                                                      Federal Bureau of Investigation

Subscribed and sworn to before me on March 13th, 2017,

_____
DONALD L. CABELL
United States Magistrate Judge